UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ALLEN D. CONFER,                    :
                                    :CIVIL ACTION NO. 3:17-CV-00597
        Plaintiff,                  :
                                    :(JUDGE CONABOY)
        v.                          :
                                    :
CAROLYN W. COLVIN,                  :
ACTING COMMISSIONER OF              :
SOCIAL SECURITY                     :
                                    :
        Defendant.                  :
                                    :
                                    :
                                    :

_____

**MEMORANDUM**

## I.   Procedural Background.

    We consider here Plaintiff's appeal from an adverse decision
of the Social Security Administration ("SSA" or "Agency") regarding
his application for Disability Insurance Benefits ("DIB").
Plaintiff's application was initially denied at the administrative
level whereupon he requested a hearing before an Administrative Law
Judge ("ALJ"). He received that hearing May 19, 2015. The ALJ
denied Plaintiff's application by written decision dated August 22,
2015. (Doc. 12-2). The Appeals Counsel denied Plaintiff's request
for review by letter dated February 8, 2017. Plaintiff then
appealed to this Court by Complaint (Doc. 1) dated April 5, 2017.
This Court has jurisdiction over this matter pursuant to 42 U.S.C.

1

§ 405g.

## II. Testimony before the ALJ.

A hearing was conducted before ALJ Edward Brady in Wilkes-Barre, Pennsylvania on May 19, 2015. Testimony was taken from Plaintiff and from Michele Giorgio, a vocational expert ("VE"). Also present was Charles Rosamilia, Plaintiff's attorney. The testimony may be summarized as follows.

Plaintiff testified that he lived in the area of Lock Haven, Pennsylvania but that he was essentially homeless at the time of the hearing. He had been homeless since June of 2014. Plaintiff last worked in 2013 and that employment ended when his employer went bankrupt. (R. 53-54). He has not worked since June of 2013 and has sustained himself on unemployment compensation benefits since then. These benefits ran out in January of 2014. (R. 55).

Plaintiff has a heart condition and had an aortic valve replacement in 2011. He stated that he has had difficulty working since then and is always stiff and sore. He denied chest pain but stated that he is always short of breath. He has been diagnosed with asthma and has quit smoking. He breathes better when in cool temperatures. He can walk one half mile to one mile but that exacerbates his shortness of breath. He has a driver's license but does not own a car. He has difficulty with stairs due to stiffness

in his back and pain in his legs. The pain in his legs is sporadic and worsens with changes in the weather. (R. 56-57). He has no difficulty sitting for any length of time nor does he have difficulty in standing as long as he can move around. He estimates that he can lift and carry about ten pounds. (R. 58).

With respect to his mental health, Plaintiff stated that he was treating with a Doctor Karmini (sic). He has been seeing Dr. Karmini for more than a year. She has been prescribing medications for him to alleviate depression and suicidal thoughts, to help him tolerate being around people, and to stop his mind from racing. His depression is constant. He spends a lot of time by himself. He had suicidal thoughts when he was younger but the medicines that Dr. Karmini has prescribed have caused these things to stop. He essentially interacts only with his family. He gets along well with his family members but does argue with some of them occasionally. He has no significant other but does have two daughters from a previous relationship. He does not see his daughters often because they live at a distance and his homelessness complicates his efforts to see them. (R. 58-63).

Plaintiff testified further that he is anxious about his financial situation and his lack of a fixed place to live. He is also anxious about being in a group of people and does not know

whether he could deal with working in a group setting. He also testified to being somewhat forgetful, particularly with regard to his short-term memory. He does remember to take his medications. (R. 64-66).

Upon questioning by his attorney, Plaintiff indicated that he sleeps twelve to thirteen hours from six o'clock in the evening to six o'clock or seven o'clock the next morning. He has not driven at all for two years because he makes wrong decisions on the road. He has been pulled over by the police on suspicion of drunk driving because he was swerving. This swerving was actually caused by a reaction to his medications. He formerly road a bike and fished but no longer has any hobbies. One of the medications he takes makes it difficult for him to stop moving his hands. His energy level is low. He basically sits most of the day and gets up and walks as needed to help control his pain. He neither reads nor watches television. He eats only one meal each day and stated that he is five feet seven inches tall and weighs two hundred and twenty pounds. He is not trying to lose weight but has lost ten pounds since the last time he saw his doctor. In response to a question regarding his self-esteem, Plaintiff replied: "I just don't know what to do with myself sometimes. …the last couple of years it's like downhill." (R. 67-70).

VE Michele Giorgio also testified. She stated that Plaintiff was a high school graduate who, at forty-nine years of age, would be considered a "younger individual". His past relevant work as a "bin checker/tagger" was a "medium, unskilled" variety. His prior work at a Wal-Mart Super Center involved stocking shelves and unloading trucks and was characterized as "heavy, unskilled". The ALJ asked Ms. Giorgio a hypothetical question in which she was to assume a person the same age as Plaintiff with the same educational and vocational background. She was also to assume that the hypothetical person could perform a limited range of light work such that he could only occasionally bend, balance, stoop, kneel, crawl, crouch, and climb and that he would be limited to simple and repetitive unskilled work. Finally she was to assume that the hypothetical person could not interact with the public and only occasionally could interact with coworkers or supervisors. Based on these assumptions, the VE concluded that the hypothetical person could not perform any of Plaintiff's past relevant work but that the hypothetical person could perform jobs such as "mail clerk" and "hand packer". She stated that these jobs exist in significant numbers in the Commonwealth.

When the ALJ modified the hypothetical question such that the hypothetical person would have the same limitations previously

discussed but also be confined to sedentary jobs the VE stated that work within those criteria such as "sorter", "sampler", and "inspector" could be performed by the hypothetical person. When the ALJ added an additional assumption that the hypothetical person would be off task up to 33% of each workday or miss at least one day of work each week the VE responded that no work would be available to such a person. The VE stated further that her testimony was consistent with the Dictionary of Occupational Titles. (R. 67-74).

## III. Medical Evidence

A. Dr. Paul Simpson.

Dr. Simpson was Plaintiff's treating physician from at least May of 2012 through May of 2013. His progress notes regarding his treatment of Plaintiff document ten physical examinations interspersed regularly during that time frame. (R. 410-457). These progress notes are very similar. Each notes that Plaintiff denies:

(1) anxiety, depression, hallucinations, confusion, difficulty sleeping, suicidal ideation, excessive anger, withdrawal, hyperactivity, inattentiveness, or behavioral problems; (2) muscular weakness, lack of coordination, muscle cramps, neck pain, back pain, shoulder pain, hip pain, knee pain, or foot pain; and (3) difficulty concentrating or problems related to memory. On each

of these visits Plaintiff appeared as "well-nourished, alert, in no acute distress." Dr. Simpson's progress notes of Plaintiff's examinations dated March 5, 2013 and May 7, 2013 also document that Plaintiff was grossly oriented to time and place, had normal ability to communicate, had both immediate and long-term recall intact, had normal concentration and attention span, had fund of knowledge within normal limits, exhibited normal mood, appropriate affect, logical thought process and an awareness of current events.

Dr. Simpson executed a Physical Capacities Evaluation Form regarding Plaintiff on April 8, 2015 (R. 510). Dr. Simpson opined that Plaintiff could sit for up to five hours in an eight hour work day but that his ability to stand or walk would be less than one hour. Plaintiff was deemed: capable of lifting and carrying up to ten pounds occasionally; incapable of simple grasping with his hands, or pushing and pulling arm controls; and incapable of fine manipulation. Dr. Simpson indicated that Plaintiff could use both feet to operate pedals and foot controls but that he could never bend, squat, crawl, climb, or reach and that he could not be exposed to unprotected heights, moving machinery, changes in temperature, or exposure to dust and fumes.

B. Punyabrata Roy.

Dr. Roy was Plaintiff's treating psychiatrist from at least March of 2012

through August of 2013. Dr. Roy's progress note from six

consultations in that time frame uniformly assessed Plaintiff to be

afflicted by impulse control disorder, anxiety disorder, and

depressive disorder. Dr. Roy's notes also indicate that Plaintiff

consistently denied homicidal or suicidal ideas and hallucinations.

His insight and judgment was generally described as "fair". His

mood was described variously as "appropriate" and "calm and

cooperative". There is the repeated assessment that Plaintiff "is

not psychotic at this time".

Dr. Roy did not provide a written opinion as to the effect  Plaintiff's

diagnoses would have on his ability to work. He did, however,

consistently assess Plaintiff's Global Assessment of Functioning

scores to be between fifty-seven and sixty. These scores generally

indicate moderate symptomology.[1]

---

[1] While the most recent edition of the Diagnostic Statistical Manual of Mental Disorders no longer assesses symptom severity, diagnostic severity, and disability in terms of Global Assessment of Functions scores (GAF's), at the time of Plaintiff's assessments the GAF scale was used to report a clinician's judgment of the patient's overall level of functioning on a scale of one to one hundred. All of Plaintiff's recorded GAF's that are documented in the record were between fifty-two and sixty. A GAF score of twenty-one to thirty indicates that behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment. A GAF score of thirty-one to forty indicates some impairment in reality testing or communication and that speech is at times illogical, obscure or irrelevant and may indicate major impairment in several areas such as work or school, family relations, judgment, thinking, or mood. A GAF score of forty-one to fifty indicates serious symptoms such as suicidal ideation, severe obsessional rituals, frequent shop lifting or any impairment in social occupation or school functioning. A GAF score of fifty-one to sixty, like those exhibited by the Plaintiff in this case, indicates "moderate symptoms such as flat affect, occasional panic attacks, or moderate difficulty of social, occupation, or school functioning." See Diagnostic Statistical Manual of Mental Disorders 34 (4th ed., text Rev., 2000).

C.  Dr. Sreedevi Komarneni.

Dr. Komarneni completed a Medical Source Statement of Ability to Do Work-
Related Activities that addressed Plaintiff's mental status May 11,
2015. (R. 511-512). Dr. Komarneni indicated that Plaintiff: had
moderate impairment in understanding, remembering, and carrying out
simple instructions; had marked impairment in his ability to make
simple work-related decisions; and severe impairment in his ability
to understand and carry out detailed instructions or to make
complex work-related decisions.[2]

D. David Smock, Ph.D.

Dr. Smock saw Plaintiff once in his capacity as a consulting psychiatrist for
the Bureau of Disability Determination. This consult took place on
January 4, 2014. Dr. Smock's disability evaluation (R. 501-509)
stated:

It is felt that he would have some difficulty

sustaining attention to work. There were

times when items had to be repeated to him

because he did not get the stimulus item

clear the first time. This is clearly what

_____

[2] Plaintiff's counsel asserts that Dr. Komarneni was a treating Psychiatrist. (Doc. 16 at 6).
However, the Court has found nothing in the record to substantiate Dr. Komarneni's characterization
as that of a treating psychiatrist.

happened in the job setting. He would have
significant problems following and
understanding directions and making
appropriate decisions in the job setting,
especially if material starts to get
complicated. While no formal testing was
completed, it is likely that his IQ falls at
least in the borderline intellectual range,
perhaps lower. He would have problems doing
simple tasks independently and would be
overwhelmed by complex tasks. He would have
problems learning new tasks. He would have
fairly sufficient difficulty relating
effectively to peers, supervisors, and
customers. His arithmetic skills are quite
limited, but it is felt that he could
basically manage his own funds.

Dr. Smock diagnosed depressive disorder and expressed the
possibility of borderline intellectual functioning and mild mental
retardation. (R. 504).

Dr. Smock also assessed Plaintiff as demonstrating: moderate
impairment in understanding, remembering, and carrying out simple

instructions; marked impairment in his ability to make simple work-related decisions; and severe impairment in his ability to understand, carry out, or make judgments regarding complex, work-related instructions. With respect to Plaintiff's social functioning, Dr. Smock stated that Plaintiff had marked impairment in his ability to interact appropriately with the public, co-workers or supervisors.

      E. Dr. Paul Perch.

Paul Perch, Ed.D., a non-examining consulting phycologist, completed a Mental Residual Functional Capacity Assessment of Plaintiff on January 15, 2014 after reviewing progress notes and opinions from Drs. Smock, Roy, and Simpson. (R. 85-88). Dr. Perch found that Plaintiff had no significant limitations in: the ability to remember locations and work procedures; the ability to understand and remember simple instructions; the ability to maintain attention and construction for extended periods; the ability to comply with a work schedule and maintain regular attendance; the ability to sustain an ordinary routine without special supervision; the ability to work in proximity to others without distraction; and the ability to interact appropriately with the general public. Dr. Perch also found that Plaintiff had moderate limitations in: the ability to accept instruction and respond appropriately to criticism from

supervisors; and the ability to respond appropriately to changes in the work place. Finally, Dr. Perch found that Plaintiff had marked limitations in the ability to remember and carry out detailed instructions.

Dr. Perch opined: "the claimant can sustain an ordinary routine and adapt to routine changes without special supervision. The claimant would be able to make simple decisions. Review of the medical evidence reveals that the claimant retains the abilities to manage the mental demands of many types of jobs not requiring complicated tasks. (R. 87). Dr. Perch also indicated that Dr. Smock's opinion was "an overestimate of the severity of the individual's (the claimant's) restrictions/limitations and based only on a snapshot of the individual's functioning." R. at 88). Dr. Perch concluded that Plaintiff could perform his past relevant work as a checker/tagger.

### F. **Dr. Louis Tedesco, M.D.**

Dr. Tedesco completed a Physical Residual Functional Capacity Assessment of Plaintiff on December 6, 2013 after reviewing Plaintiff's medical records. Dr. Tedesco found that Plaintiff could: occasionally lift and carry up to twenty pounds; frequently lift and carry up to ten pounds; stand and/or walk up to six hours in an eight hour workday; sit for up to six hours in an eight hour workday; and push and pull

without limitation except for those stated for lifting and carrying. Dr. Tedesco found also that Plaintiff had no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations. (R. 84-85).

**IV.**                    **ALJ Decision.**

The ALJ's decision (Doc. 12-2 at 9-25) was unfavorable to the Plaintiff. It includes the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act for December 31, 2018.

2. The Claimant has not engaged in substantial gainful activity since June 10, 2013, the alleged unset date.

3. The Claimant has the following severe impairments: coronary artery disease, status-post valve replacement, a bipolar disorder, an impulse control disorder, and an anxiety disorder.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of

13

the impairments in 20 CFR Part 404, Sub
Part P, Appendix 1 (20 CFR 404. 1520(d),
404.1525 and 404.1526).

5. After careful consideration of the entire
record, the undersigned finds that the
claimant has the residual functional
capacity to perform light work as defined
in 20 CFR 404.1567 (b) except the
claimant: could occasionally bend,
balance, stoop, kneel, crouch, crawl, and
climb at jobs which are simple, routine,
and repetitive work, generally described
as unskilled; could have no interaction
with the public and could have occasional
contact with co-workers and supervisors.

6. The claimant is unable to perform any past
relevant work.

7. The claimant was born on August 9, 1965
and was forty-seven years old, which is
defined as a younger individual age 18-49,
on the alleged disability onset date.

8. The claimant has at least high school

education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

ability as defined in the 11 Social Security Act, from June 10 2013, through the date of this decision.

**V.**

**Disability Determination Process.**

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[3]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant=s impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 CFR ''

---

[3]  ADisability@ is defined as the Ainability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .@  42 U.S.C. ' 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. ' 423(d)(2)(A).

404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant=s abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R. at 22).

**VI. Standard of Review.**

This Court's review of the Commissioner=s final decision is limited to determining whether there is substantial evidence to support the Commissioner=s decision. 42 U.S.C. ' 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means Amore than a mere scintilla". It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.@ *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third

17

Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidenceB-particularly certain types of evidence (e.g., that offered by treating physicians)B-or if it really constitutes not evidence but mere conclusion. *See Cotter*, 642 F.2d at 706 (ASubstantial evidence@ can only be considered as supporting evidence in relationship to all the other evidence in the record.@) (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, Ato say that [the] decision is supported by substantial evidence approaches an abdication of the court=s duty to scrutinize the record as a whole to determine whether the conclusions reached are

rational.@ *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: ASince it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper.@ *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). AThere is no requirement that the ALJ discuss in her opinion every tidbit of evidence included in the record.@ *Hur v. Barnhart*, 94 F. App=x 130, 133 (3d Cir. 2004). A[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner=s decision, . . . the *Cotter* doctrine is not implicated.@ *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner=s final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d

19

1185, 1190-91 (3d Cir. 1986); 42 U.S.C. ' 405(g) (A[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .@). AHowever, even if the Secretary=s factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented.@ *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ=s decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App=x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) (A[O]ur primary concern has always been the ability to conduct meaningful judicial review.@). Finally, an ALJ=s decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

**VII.**

**Discussion**

    **A. General Considerations**

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* AThese proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act.@ *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted Athe cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant=s disability, and that the Secretary=s responsibility to rebut it be strictly construed.@ *Id.*

**B. Plaintiff's Allegations of Error.**

**1. Whether the ALJ failed to properly account for Plaintiff's impulse control disorder in determining his RFC?**

21

The ALJ's RFC determination provided, among other things, that the Plaintiff would be limited to jobs requiring only simple, routine, repetitive, and unskilled work and would be further limited to jobs where he would have no exposure to the public and only limited exposure to co-workers and supervisors. (R. at 17). Plaintiff asserts that the RFC determination makes inadequate provision for his impulse control disorder but cites no authority to support the proposition that the ALJ's RFC determination did not adequately consider the limiting effects of that disorder. Significantly, Plaintiff fails to point to any specific limitation documented in the record that relates to his impulse control disorder and renders him unemployable. As Defendant observes, a diagnosis that a condition exists does not establish that it is disabling. 20 CFR § 404.1521 (See Doc. 17 at 10).

The Court's review of the record discloses that, while the diagnoses of impulse control disorder is consistently reported, the progress notes of two treating physicians, Drs. Simpson and Roy, are devoid of any mention of impairments flowing directly from the condition. As indicated in the summary of the medical evidence (Section III, ante), both treating physicians consistently described Plaintiff as fully oriented, communicative, normal in terms of concentration and attention span, exhibiting normal mood

and appropriate affect and displaying logical thought process. Dr. Roy repeatedly assessed Plaintiff at a GAF of 57 to 59, scores indicating only moderate impairment in function. The combined history provided by Drs. Simpson and Roy simply does not establish the Plaintiff's impulse control disorder required additional limitations over and above those provided (limitation to simple, repetitive tasks, limited exposure to co-workers and supervisors, and no exposure to the general public)in the ALJ's RFC determination. The totality of the progress notes provided by Drs. Simpson and Roy afforded the ALJ a reasonable basis for the conclusion he drew. Accordingly, Plaintiff's allegation of error on this point is rejected.

**2. Whether the ALJ inappropriately evaluated the medical evidence regarding Plaintiff's physical limitations?**

With respect to his physical limitations, Plaintiff contends that the ALJ improperly preferred the physical capacities evaluation of a consulting physician over that of his primary care doctor, Dr. Simpson. Dr. Simpson had opined that Plaintiff had lifting, carrying, standing, and sitting limitations that were more restrictive than those identified in the ALJ's RFC determination. Plaintiff asserts: "these findings were made without any medical documentation to support the more extensive physical capacities

findings of the Administrative Law Judge." (Doc. 16 at 7). This may
be so, but it is no avail to Plaintiff because the documentation he
relies upon (the physical capacities evaluation performed by Dr.
Simpson found in the Record at 510) is starkly inconsistent with
the progress notes he created during his extended treatment of
Plaintiff during the relevant time period. Over the course of ten
examinations leading up to Plaintiff's alleged onset of disability
date, Dr. Simpson consistently noted that Plaintiff was free of
neck pain, back pain, shoulder pain, hip pain, knee pain, or foot
pain; displayed no muscular weakness; experienced no muscle cramps,
and displayed no lack of coordination. Significantly, in the last
two progress notes Dr. Simpson entered on March 5, 2013 and May 7,
2013 (R. at 449 and 456 respectively), he recorded Plaintiff's
strength as normal in all extremities with normal muscle tone and
normal muscle bulk, and no atrophy. These findings are simply
inconsistent with Dr. Simpson's physical capacities evaluation (R.
at 510) finding that Plaintiff can only occasionally lift or carry
up to ten pounds. Given the apparent inconsistency between Dr.
Simpson's progress notes and his physical capacities evaluation the
ALJ may not be faulted for his unwillingness to rely upon that
evaluation.

On December 6, 2013 Dr. Louis Tedesco completed the State Agency Physical Assessment of claimant. Dr. Tedesco had available to him all Plaintiff's medical records up to December of 2013 including Dr. Simpson's progress notes regarding his treatment of the claimant between May 3, 2012 and May 7, 2013. Dr. Tedesco's review of Plaintiff's medical history persuaded him the Plaintiff had the physical capacity to: occasionally lift up to twenty pounds and frequently lift up to ten pounds; stand or walk six hours in an eight hour work day; sit six or eight hours in an eight hour work day; operate hand and foot controls; and work without postural, manipulative, visual, communicative, or environmental limitations. The ALJ gave substantial weight to Dr. Tedesco's assessment because "it is largely consistent with the more moderate symptomology experienced by the claimant." (R. at 21). The ALJ added: "the claimant explained in his hearing testimony that he has no sitting or standing limitations. He added that he is able to walk up to one mile without issue. Admittedly, the claimant's submissions show that he does experience shortness of breath, to an extent. Nevertheless, this limitation does not preclude him from walking a considerable distance…". (See R. at 56-59).

Having reviewed the ALJ's Decision, all pertinent medical evidence in the file, and the parties' briefs, the Court concludes

25

that Plaintiff's argument regarding the ALJ's evaluation of the medical evidence must fail. As noted above, the totality of Dr. Simpson's treatment notes regarding Plaintiff's physical impairments are so benign as to be unsupportive of his Physical Capacities Evaluation dated April 8, 2015. In fact, Plaintiff's own testimony at his hearing approximately seven weeks later is equally inconsistent with Dr. Simpson's assessment. (R. at 56-58). Under these circumstances, the ALJ was well within his discretion in elevating the opinion of Dr. Tedesco.

**3. Whether the ALJ improperly evaluated the medical evidence regarding the Plaintiff's cognitive/emotional impairments?**

Plaintiff asserts that the ALJ improperly gave greater weight to the opinion of a consulting psychologist, Paul Perch, than to those opinions provided by an evaluating psychologist, David Smock, and a medical doctor, Sreedevi Komarneni. (Doc. 16 at 5-10). Plaintiff contends further that "20 C.F.R. § 404.1527(c)(2) provides that, if a treating source opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record the ALJ must 'give it controlling weight.'" (Id. at 10). This is both a correct statement of the law and one that is unhelpful to Plaintiff because neither the opinion of Psychologist

Smock nor that of Dr. Komarneni can be viewed as "well supported by medically acceptable clinical and laboratory diagnostic techniques and … not inconsistent with other substantial evidence in the case."

Dr. Smock, a one-time evaluating psychologist, provided a relatively dire picture of Plaintiff's intellectual and emotional capacities after reviewing the treatment records of Doctors Simpson and Roy (See pages 6-8, ante). Both Doctors Simpson and Roy noted repeatedly that Plaintiff displayed no homicidal or suicidal ideation, displayed normal affect and mood, presented as oriented to time and place, displayed normal thought process and thought content, and did not complain of any difficulty with concentration or memory. In short, the progress notes of these treating physicians, each of whom saw Plaintiff on numerous occasions, were consistently benign as to Plaintiff's cognitive/emotional difficulties. As such, the opinion of Psychologist Smock was highly "inconsistent with other substantial evidence in the case." Thus, under 20 C.F.R. § 404.1527 (c)(2), the ALJ was free to accord greater weight to other substantial evidence of record, the consistently more benign progress notes of Drs. Roy and Simpson over a lengthy course of treatment. This is precisely why the ALJ refused to accord significantly weight to Psychologist Smock's

opinion. (R. at 19-20). The ALJ decision in this regard is reasonable and will not be disturbed.

Dr. Komarneni also proffered a Medical Source Statement dated May 11, 2015 that limited Plaintiff more severely than the RFC that the ALJ assigned to him. Specifically, he indicated on a "check the box" form that Plaintiff had marked difficulties: in his ability to make simple work-related decisions; in his ability to interact with the public, supervisors, or co-workers; and in his ability to respond appropriately to usual work situations.[4] The Court will assume that Dr. Komarneni was a treating physician despite the fact that the entire 617 page record in this case includes only the two page Medical Source Statement of May 11, 2015 from her. However, this document is completely unsupported by diagnostic or clinical findings. While the Court would normally accord great weight, if not controlling weight, to the opinion of a treating physician, such is not the case where, as here, Dr. Komarneni's opinion is completely unsupported by diagnostic or clinical findings and is also inconsistent with other medical evidence in the record (the progress notes of treating physicians Simpson and Roy). If "the opinion of a treating physician conflicts with that of a non-

---

[4] Forms that merely require a physician to place checks in boxes are "weak evidence at best" in the context of a disability analysis. Mason v. Shalala, supra, at 1065.

treating, non-examining physician, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason." Jones v Sullivan, 954 F2d 125,129) 3rd Cir. 1991).

Here the ALJ gave little weight to Dr. Komarneni's opinion "as it does not include the requisite examination findings required to support such extreme limitation. Moreover, the evidence of record, including his mental status examination findings and the GAF scores assigned to the claimant failed to corroborate such substantial limitation." (R. at 200). Having reviewed the record, especially the numerous progress notes of Doctors Simpson and Roy, we must conclude that the ALJ's decision to accord little weight to Dr. Komarneni's Medical Source Statement was justified under the circumstances.

As the Government contends in its brief (Doc. 17 at 22), "State Agency Medical and Psychological Consultants are highly qualified physicians and psychologists who are experts in the evaluation of medical issues in disability claims." SSR 96-6p. When an ALJ elects to assign great weight to a State Agency Psychological Consultant (Dr. Perch) and to subordinate contrary opinion of the treating physician, he may appropriately do so when the treating physician's opinion is unsupported by treatment records, inconsistent with the claimant's clinical presentation

over a lengthy period, and contradicted by other evidence of record. 20 C.F.R. § 404.1527(c)(2). Accordingly, the Court finds that the ALJ's decision to accord more significant weight to Dr. Perch's assessment constituted substantial evidence upon which the ALJ was entitled to rely.

**VIII. Conclusion.**

For all the reasons referenced in this Memorandum, the Court concludes that substantial evidence supports the Agency's decision. Thus, Plaintiff's appeal from the final decision of the Agency will be denied. An Order consistent with this conclusion will be filed contemporaneously.

**BY THE COURT,**

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: March 7, 2018